UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAQUELINE P. NICHOLS,

    Plaintiff,

     v.

DR. JAMES BILLINGTON, Librarian,
United States Library of Congress,

    Defendant.

Civil Action No. 02-2438 (CKK)

**MEMORANDUM OPINION**
(July 25, 2005)

Plaintiff, a former employee of the United States Library of Congress, brings this

employment discrimination case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e, *et seq.* ("Title VII"), and the Americans With Disabilities Act, 42 U.S.C. § 12101, *et*

*seq.* ("the ADA"), essentially alleging that Defendant ("Defendant" or "the Library") (1)

discriminated against Plaintiff in numerous ways based on her race and color; (2) created a

hostile work environment based on Plaintiff's race and gender; (3) retaliated against Plaintiff for

engaging in protected Title VII activity; and (4) failed to accommodate Plaintiff as required by

the strictures of the ADA.  Currently before the Court is Defendant's Motion for Summary

Judgment, which contends that Plaintiff cannot establish a *prima facie* case of discrimination,

hostile work environment, or retaliation, and asserts that Plaintiff's existing medical condition

falls outside of the protections afforded by the ADA.  Upon a consideration of Defendant's

motion, Plaintiff's Opposition, Defendant's Reply, the relevant case law, and the entire record

herein,[1] the Court shall grant Defendant's Motion for Summary Judgment.

## I: BACKGROUND

A.      *Plaintiff's Time in the Library's C&L Division*

In 1993, Plaintiff, an African-American female, was employed as a receptionist in the

Library of Congress' ("the Library") Contracts and Logistics ("C&L") Division.  Def.'s Stmt. of

Mat. Facts Not in Dispute ("Def.'s Stmt.") at ¶ 1, 1; *see also* Ex. 1 (Decl. of Mr. Gary Columbia,

former Asst. Chief of the C&L Division) ("Columbia Decl.") at ¶ 1, 1.[2]  In that position, Plaintiff

---

[1] Upon an initial review, the Court concluded that the exhibits provided by the parties as attachments to their filings left out some detail as to the exact progress of events.  As such, the Court ordered, on July 7, 2005, that by close of business on Monday, July 11, 2005, Plaintiff was to provide the Court with (1) a complete copy of the Union's 2003 arbitration hearing brief, part of which is attached as an exhibit to her Opposition, and (2) all exhibits identified by that brief, including all letters from Plaintiff's physician(s) to Defendant.  The Court further ordered that, by close of business on Monday, July 11, 2005, Defendant was to provide the Court with (1) all post-1996 letters from Plaintiff's physician(s) it has in its possession and (2) all exhibits it introduced in the 2003 arbitration hearing regarding Plaintiff's termination.  *See Nichols v. Billington*, Civ. No. 02-2438 (D.D.C. July 7, 2005) (minute order requiring additional factual evidence).  Both parties complied with the Court's Order and submitted the requested materials.  *See* Def.'s Notice of Filing; Pl.'s Notice of Filing.  The Court includes this newly-provided information in its discussion of the factual background surrounding this action and its subsequent analysis, and emphasizes that the record is now complete.

[2] The Court notes that, despite repeated instructions, Plaintiff did not file a response to Defendant's Statement of Material Facts Not in Dispute.  The Court points out that its October 20, 2004 Scheduling Order in this case specifically stressed that

The parties shall comply **fully** with Local Rule LCvR 7(h) (formerly 7.1(h)) and 56.1.  The Court strictly adheres to the dictates of Local Civil Rules 7(h) and 56.1 and may strike pleadings not in conformity with these rules.  *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002).  A party responding to a statement of material facts must respond to each paragraph with a correspondingly numbered paragraph, indicating whether that paragraph is admitted or denied.  The responding party should include any information relevant to its response in that paragraph.  If the responding party has additional facts that are not addressed in the corresponding paragraphs, the responding party should include these at the end of its responsive statement of facts.  At all points, parties must furnish precise citations to the

was paid at a Grade Scale ("GS") Level of 5.  *See* Second Am. Compl. ¶ 12.  According to

Plaintiff, two (2) other unidentified African-American females held the same position, *id.* ¶ 13,

while four (4) Caucasian females -- Ms. Melissa Stevenski, Ms. Charlotte Logan, Ms. Morgan

Day, and Ms. April Sliwinski "performed the same or similar work as Plaintiff," *id.*; *see also*

Def.'s Mot. for Summ. J., Ex. 8 (Nichols' Dep.) (identifying Sliwinski).  During this time period,

Mr. Gary Columbia, a white male, *id.* ¶ 11, was Assistant Chief of the C&L Division, and

supervised much of Plaintiff's work; his immediate superior was Ms. Patricia Gardner, then

Acting Chief of C&L, who in turn reported to Mr. James R. Trew, Director of the Integrated

Support Systems.  *See* Def.'s Mot. for Summ. J., Ex. 1 (Columbia Decl.) at ¶ 1, 1.

Three important events occurred around 1993 that provided the initial springboard for

Plaintiff's current suit.  First, Plaintiff requested that partitions be erected around her work area.

*See* Def.'s Stmt. ¶ 2.  At the time, her work area was a desk located in a visible area near the

front door of the entrance to the building in which C&L was housed.  *See* Def.'s Motion for

Summ. J., Ex. 1 (Columbia Decl.) at ¶ 2, 1.  This entrance was locked, and visitors needed to be

---

portions of the record on which they rely . . . . The Court assumes facts identified
by the moving party in its statement of material facts are admitted, unless such a
fact is controverted in the statement of genuine issues filed in opposition to the
motion.  LCvR 7(h), 56.1.

*See Nichols v. Billington*, Civ. No. 02-2438 (D.D.C. Oct. 20, 2004) (scheduling order).  Plaintiff
has failed to comply with this Order.  Moreover, Plaintiff's Opposition to Defendant's Motion
for Summary Judgment attaches only a post-hearing brief filed by her union, Local 2477, arising
out of her arbitration process, and provides no other exhibits, declarations, or testimony.  Finally,
in her Opposition, Plaintiff essentially adopts Defendant's timeline of the events at issue.  *See*
Pl.'s Opp'n at 1-3.  Given these failings, the Court sets out the "Background" of this case, relying
heavily on Defendants' Statement and the uncontested collection of evidence introduced by
Defendant and attached to his motion.  The Court also includes information provided by both
Plaintiff and the Library in their respective Notices of Filing.

screened before entering the building.  *Id.*  Part of Plaintiff's responsibilities at the time included

screening visitors who entered the building.  *Id.*  Concerned that partitions placed around

Plaintiff's desk would negatively affect the security of the area by blocking the view of visitors

approaching the front desk, Mr. Columbia objected to Plaintiff's planned partitions in

conversations with Ms. Gardner and Mr. Trew.  *Id.* at ¶ 3, 1.  However, Ms. Gardner chose to

disregard Mr. Columbia's concerns, and allowed Plaintiff to erect partitions around her work

station.  *Id.* at ¶ 4, 1.  These partitions were eventually removed in October 1993, *see* Second

Am. Compl. ¶ 17, by Mr. Columbia for security reasons upon orders from Mr. Trew after Ms.

Gardner had left the C&L and Mr. Trew discovered their existence, *see* Def.'s Mot. for Summ. J.,

Ex. 1 (Columbia Decl.) at ¶ 4, 1.  Plaintiff's pay and the nature of her work remained unchanged

as a result of the erection and the eventual removal of these partitions.  Def.'s Stmt. ¶ 3, 1.

Second, in February 1993, Mr. Columbia issued Plaintiff a Performance Rating and

Within-Grade Certification for Plaintiff's work performance from December 15, 1991, to

December 15, 1992.  *See* Second Am. Compl. ¶ 15; Def.'s Stmt. ¶ 4.  In the Performance Rating,

Mr. Columbia identified Plaintiff's performance as "satisfactory."  *See* Second Am. Compl. ¶ 16;

Def.'s Stmt. ¶ 4.  Plaintiff objected to this rating because during the relevant work period, she

apparently received "at least two (2) letters of appreciation regarding her outstanding work

performance."  Second Am. Compl. ¶ 15.  Regardless, Plaintiff's pay and benefits were not

affected by her "satisfactory" rating.  Def.'s Stmt. ¶ 4.

Third, during 1993 and the years immediately prior, several of the Caucasian female

employees who allegedly "performed the same or similar work as Plaintiff," Second Am. Compl.

¶ 13, were promoted to GS-6 pay status, while Plaintiff and the other two African-American

female clerks were "not promoted to the GS-6 level until much later," which allegedly "caus[ed] [Plaintiff] both financial and emotional distress," *id.* at ¶ 14.  Ms. Morgan Day was selected for a GS-6 Procurement Clerk position under an open vacancy announcement for that position in December 1991.  Def.'s Motion for Summ. J., Ex. 12 (Personnel Action Recommendation for Vacancy Announcement #10622).  Ms. Charlotte Logan was selected for a GS-6 Supply Technician under an open vacancy in June 1992.  *Id.*, Ex. 13 (Personnel Action Recommendation for Vacancy Announcement #21040).  Ms. Melissa Stevenski was promoted to a GS-6 Procurement Clerk position under an open vacancy announcement for that position in December 1991.  *Id.*, Ex. 14 (Personnel Action Recommendation for Vacancy Announcement #10622). She was then temporarily promoted to a GS-7 Contract and Procurement Specialist position in July 1993 -- a temporary promotion that ended in October 1993 upon her return to her GS-6 Procurement Clerk position.  *Id.*, Ex. 15 (Personnel Action Recommendation for 90 Day Temporary Promotion) & 16 (Personnel Action Recommendation Reflecting Change to Lower Grade).  Ms. April Sliwinski was temporarily promoted from a GS-4 Supply Clerk to a GS-5 Supply Clerk in December 1993 -- the same level as Plaintiff.  *Id.*, Ex. 17 (Personnel Action Recommendation Reflecting Sliwinski's Marriage and Name Change) & 18 (Personnel Action Recommendation for "Conv to Expected Appt NTE 120 Days").

In apparent response to these promotions, Plaintiff filed an "Allegation of Discrimination" with the Equal Employment Opportunity Complaints Office ("EEOCO") on August 6, 1993, complaining, *inter alia*, that Mr. Columbia evinced "racial discrimination in promotional practices."  *See id.*, Ex. 19 (Allegation of Discrimination).  Plaintiff later filed a "Complaint of Discrimination" with the EEOC on July 26, 1994, that complained of, among

other things, the alleged rapid promotion by Mr. Columbia of these Caucasian females within

C&L at her expense.  *See id.*, Ex. 19a (Complaint of Discrimination).  However, a review of the

record indicates an error in Plaintiff's basic assumption:  Mr. Columbia played no role in the

promotion of these four (4) Caucasian women, and never acted as the "recommending officer"

under any Personnel Action Recommendation cited to by Plaintiff.  *See, e.g.*, Exs. 12-18.

During 1994, training opportunities -- or the lack thereof -- became an issue for Plaintiff.

*See* Second Am. Compl. ¶ 20.  In May 1994, Plaintiff was scheduled to attend a two-day training

in "Ethics in Procurement."  Def.'s Stmt. ¶ 5.  The day before the training was to begin, Mr.

Columbia received a notice from the Library's Health Services Office that Plaintiff's doctor had

ordered her to avoid walking.  *Id.*  Upon receipt of this information, Mr. Columbia cancelled the

scheduled training, which was not critical to the performance of Plaintiff's job.  *Id.*  However,

soon thereafter, Mr. Columbia was advised by the Health Services Office that Plaintiff's doctor

had lifted the restriction on walking, and Mr. Columbia approved the training.  *Id.*  During this

same time period, Plaintiff was scheduled to take another training course, but the course was

ultimately cancelled by the Division Office due to a lack of funding.  *Id.* ¶ 6.  Importantly,

Plaintiff suffered no loss of pay or benefits, and experienced no change in her duties, as a result

of issues surrounding available training.  *Id.* ¶ 6; *see also* Def.'s Mot. for Summ. J., Ex. 1

(Columbia Decl.) ¶¶ 7-8.

By late 1994, Plaintiffs' supervisors began an effort to remove Plaintiff from employment

with the C&L.  *See* Def.'s Stmt. ¶¶ 7-10.  This effort was initiated in April 1994 by Plaintiff's

then-immediate supervisor, Ms. Kay Klinker, who proposed that Plaintiff be suspended without

pay for ten (10) days due to insubordination.  *Id.* ¶ 7; Def.'s Mot. for Summ. J., Ex. 2 (10/20/94

Notice of Proposed Adverse Action).  Mr. Columbia continued these efforts in October 1994,

when he proposed an adverse action for Plaintiff's removal due to her repeated failure to

complete assignments, continued refusal to discuss the status of her work assignments,

uncooperative behavior, being "absent without leave" ("AWOL"), insubordination and use of

profanity directed at superiors, and failure to modify her misconduct.  *Id.* ¶ 8; Def.'s Mot. for

Summ. J., Ex. 1 (Columbia Decl.) ¶ 9, 2; Def.'s Mot. for Summ. J., Ex. 2 (10/20/94 Notice of

Proposed Adverse Action).  While the removal proposal was pending in December 1994, Mr.

Columbia issued Plaintiff a 90-day warning of possible denial of within-grade increases.  *Id.* ¶

10; *see* Def.'s Mot. for Summ. J., Ex. 4 (Dec. 7, 1994 Memorandum from Columbia to Nichols).

This warning was issued due to (1) Plaintiff's failure to attend meetings, despite written

directives to attend such meetings; (2) poor job performance; (3) Plaintiff's refusal to complete

two critical projects; and (4) Plaintiff's persistently uncooperative attitude and misconduct.  *Id.*

Plaintiff's job performance did not markedly improve during the warning period, and Mr.

Columbia denied Plaintiff's within-grade increase in March 1995.  *Id.*; Def.'s Mot. for Summ. J.,

Ex. 1 (Columbia Decl.) at ¶ 10, 2; Def.'s Mot. for Summ. J., Ex. 4 (Dec. 7, 1994 Memorandum

from Columbia to Nichols).  The effort to remove Plaintiff from employment failed, as an

arbitrator found that Plaintiff was wrongfully denied progressive discipline because the Library

of Congress effected the removal of Plaintiff prior to completing the processing of the suspension

proposal.  *Id.* ¶ 9; Def.'s Mot. for Summ. J, Ex. 3.  However, the arbitrator did explicitly find --

both in his Award and in a subsequent denial of Plaintiff's union's request for attorney's fees --

that the Library acted reasonably and for cause in removing Plaintiff.  *Id.*

B.      *Plaintiff's Time in the Library's Parking Program/ISS*

After the failed removal of Plaintiff, Plaintiff was reassigned in July 1996 to a typing

clerk position in the Library's Office of the Director of the Integrated Support Services ("ISS").

*See* Second Am. Compl. ¶ 21.  In the ISS Division, Plaintiff was assigned to work in the Parking

program, and her office was located in the underground parking garage in one of the Library's

buildings.  *Id.* ¶ 23.  Plaintiff's ultimate supervisor upon her reassignment was Ms. Linda

Garrison, who held that position until December 29, 2000; from that date forward, Plaintiff's

supervisor was Ms. Linda Washington, an African-American female.  *Id.* at ¶ 22; *see also*

Def.'s Notice of Filing, Attach. 1 (Dec. 19, 2000 letter from Ms. Garrison to Plaintiff).

After her reassignment, Plaintiff contends that an old injury flared up -- lumbar disc

syndrome.  *See* Second Am. Compl. ¶ 24; Pl.'s Opp'n, Ex. 1 (Administrative Hearing Brief filed

by Local 2477) ¶ 3, 1 (Plaintiff suffered a back injury in 1989 and was diagnosed with lumbar

disc syndrome by her doctor, Dr. Talaat Maximous).  Plaintiff asserts that this "disease"

compelled her treating physician to permanently restrict her from exposure to air drafts.  *See*

Second Am. Compl. ¶ 24.  As such, in December 1997, the Library's Health Services division

crafted a memorandum advising that Plaintiff could not sit in a "drafted area" because of a

medical problem; the memorandum went on to indicate that this was to be considered a

permanent accommodation.  *Id.* ¶ 25; Def.'s Notice of Filing, Attach. 3, Ex. B (Nov. 9, 2000

memorandum from Ms. Linda L. Garrison, Administrative Officer, Integrated Support Services

to Mr. Leonard Scott) ("Nov. 9, 2000 Garrison Memo") at 1.  However, the Library's Health

Services division tried unsuccessfully to obtain further information from Plaintiff's health care

provider to ascertain just what constituted a "draft," i.e., what was the maximum amount of air

flow that Plaintiff's medical condition would allow.  Def.'s Notice of Filing, Attach. 3, Ex. B

(Nov. 9, 2000 Garrison Memo) at 1.

On October 1, 1998, Plaintiff was relocated from her old room in the Parking Program,

LM 225, to a small conference room, LM 327, so that all of the Parking Program functions could

be kept together.  *Id.*  Room LM 327 was considered only to be a temporary location for Plaintiff.

*Id.*  However, one (1) day after her reassignment, Plaintiff reported that she was having recurrent

back pain due to a drafty workstation.  Def.'s Notice of Filing, Attach. 3, Ex. N (Dec. 4, 1998

letter from Dr. Sandra Charles, Health Services Officer, to Plaintiff's physician, Dr. Maximous)

at 1.  While Ms. Linda Garrison, Administrative Officer for the Library's Integrated Support

Services, felt that Plaintiff had not provided any documentation to support her feeling that this

work site was a "drafted area," Ms. Garrison -- "for compassionate reasons" -- had partitions

purchased and installed around Plaintiff's workstation at the front door of LM 327 and had the

Office of the Architect of the Capitol disable the air flow vent located in the ceiling above

Plaintiff's workspace within one (1) month of Plaintiff's complaints.  Def.'s Notice of Filing,

Attach. 3, Ex. B (Nov. 9, 2000 Garrison Memo) at 1-2.  Despite significant concerns regarding

the credibility of Plaintiff's claims, Robert S. Browne, Chief of the Library's Safety Services

office, conducted extensive, highly detailed scientific tests on this reconfigured workplace in

order to gauge airflow and temperature.  Def.'s Notice of Filing, Attach. 3, Ex. O (Nov. 23, 1998

memorandum from Mr. Browne to Dr. Charles).  These results were then forwarded to Dr.

Charles, who then drafted a letter to Plaintiff's physician, Dr. Maximous, informing him that "the

Library has fulfilled its obligation in supplying Ms. Nichols with a medically based reasonable

accommodation" and requesting further information regarding the nature of Plaintiff's

9

complaints and injury.  Def.'s Notice of Filing, Attach. 3, Ex. N (Dec. 4, 1998 letter from Dr.

Sandra Charles, Health Services Officer, to Plaintiff's physician, Dr. Maximous) at 2.

Apparently, this partition setup worked well for Plaintiff, as she was able to collaborate

more with her co-workers, resulting in her promotion to a GS-6 Parking Program Assistant in

February 1999.  Def.'s Notice of Filing, Attach. 3, Ex. B (Nov. 9, 2000 Garrison Memo) at 2.

During 1999, Plaintiff apparently still had minor quibbles with her LM 327 workspace, as the

Library's Health Services Office received medical documentation that supported the need for a

space heater for Plaintiff in her work area on July 20, 1999.  Def.'s Notice of Filing, Attach. 1

(July 20, 1999 memorandum from Ms. Arlene F. Klauber to Ms. Garrison).  Once again, Ms.

Garrison promptly responded to Plaintiff's needs, and purchased a space heater for Plaintiff in

July 1999.  Def.'s Notice of Filing, Attach. 3, Ex. B (Nov. 9, 2000 Garrison Memo) at 2.

At this point, it is clear that the Library had undertaken

substantial ameliorative efforts to abate the 'draft' problem, including enclosing
[Plaintiff's] workspace with glass partitions, providing a space heater, disabling
the air vents within [Plaintiff's] workspace, and testing the partitioned area to
ensure that it complied with applicable regulations regarding temperature, air
flow, and humidity.

Def.'s Mot. for Summ. J., Ex. 21 (arbitrator's denial of Plaintiff's reinstatement) at 2; *see also*

*id.*, Ex. 5 (5/2/01 Notice of Adverse Action).  However, Plaintiff was apparently still unhappy

with her workspace, despite the fact that her health care provider continued in its failure to

specify what constituted a "drafted area."  In response to her complaints, the Library's Safety

Services officer, Mr. Browne, on February 17, 2000, once again evaluated Plaintiff's work

environment using "TSI VelociCalc and TSI Q-Trak direct read instruments" to measure

"average relative humidity," "average temperature," carbon dioxide, and "average air velocity"

when standing at various locations within the workspace with the door both open and closed. Def.'s Mot. for Summ. J., Ex. 5 (5/2/01 Notice of Adverse Action), Attach. C (2/25/00 Memo to Linda Washington from Robert S. Browne, Safety Services office) at 1-2.  Mr. Browne then compared his findings to the "acceptable operable range recommended by the American Society of Heating, Refrigeration and Air-Conditioning Engineers (ASRAE)," and found that the environment provided for Plaintiff "meets or exceeds the ASRAE national standards" and was therefore safe and healthful.  *Id.*  Dr. Charles, the Library's medical officer, also investigated Plaintiff's work site on the afternoon of February 25, 2000, with Ms. Alrene Klauber.  Def.'s Notice of Filing, Attach. 3, Ex. I (Feb. 29, 2000 e-mail from Dr. Charles to Ms. Garrison) at 1. Dr. Charles reported that

> my subjective findings were consistent with the objective measurements made by the Safety Officer.  [T]he partition erected makes a significant difference in the flow of air around where she would sit.  We could not appreciate any "draft" inside of the area.  There was an appreciable increase in area currents in the open area, related to the opening and closing of the door.

*Id.*

As Plaintiff candidly admits, she has no knowledge of whether the Library's exhaustive tests were accurate or not.  *See* Def.'s Mot. for Summ. J., Ex. 10 (Nichols Dep.) at 30:10-11 ("I don't know whether the tests results are accurate or not.").  However, Plaintiff claimed that she required a full floor-to-ceiling partition in order to reduce all drafts, but provided no documentation to support her claim that the workplace was a "drafty area."  Def.'s Notice of Filing, Attach. 3, Ex. A (Feb. 29, 2000 memorandum from Ms. Garrison to Ms. Nichols) at 1. Indeed, when Health Services corresponded with Plaintiff's doctor, Dr. Maximous, Plaintiff indicated that her physician could not provide any further information.  *Id.*  Later examination

11

reports from Dr. Maximous indicate that he objected to "this kind of atmosphere and activity"

based solely upon his review of "pictures of the place of work" provided by Plaintiff.  Def.'s

Notice of Filing, Attach. 1 (4/6/00 Exam Report by Dr. Maximous re: Plaintiff); *see also* Def.'s

Notice of Filing Photographs, Attach. 1-5 (pictures of Plaintiff's workspace with partitions and

space heater).  On March 3, 2000, upon an agreement with Ms. Linda Garrison after numerous

discussions, Plaintiff began requesting and receiving Leave Without Pay, and did not work

through the remainder of 2000 calendar year.  Def.'s Mot. for Summ. J., Ex. 21 (arbitrator's

denial of Plaintiff's reinstatement) at 2-3; *see also* Pl.'s Opp'n, Ex. 1 (Administrative Hearing

Brief filed by Local 2477) ¶ 5, 1.

By early December 2000, after Plaintiff had been on Leave Without Pay for roughly nine

(9) months, the Parking Program office began experiencing substantial problems due to

Plaintiff's absence.  Def.'s Notice of Filing, Attach. 3, Ex. B (Nov. 9, 2000 Garrison Memo) at 2.

As Ms. Garrison discovered,

> Ms. Nichols' presence is critical to the operations of the Parking Program.
> Because of her absence, the Parking Program Specialist is prevented from fully
> performing her regularly assigned duties.  The Specialist must perform Ms.
> Nichols' duties of responding to routine inquiries on the phone, via email, and
> from visitors.  Additionally, the Specialist must keep the filing current as well as
> input the thousands of pieces of personnel and vehicle information into the
> automated database.

*Id.*

Faced with this need, the presence of more-than-adequate accommodations for Plaintiff,

and no documentation from Plaintiff indicating otherwise, Ms. Garrison sent Plaintiff a letter on

December 19, 2000 noting that "[t]here does not appear to be any reason for your continued

absence from the work site considering that the improvements made to your work station have

resulted in acceptable air flow."  Def.'s Notice of Filing, Attach. 1 (Dec. 19, 2000 letter from Ms.

Garrison to Plaintiff).  Ms. Garrison reminded Plaintiff:

> I have had partitions installed around your work location, had the ceiling air flow
> disabled, and purchased a space heater.  Instrument measurements taken around
> your work location indicate that the airflow in your workstation is within the
> acceptable operable range recommended by the American Society of Heating,
> Refrigeration and Air-Conditioning Engineers.  In spite of these efforts, your
> health care provider continues to advise HS [Health Services] that your work
> location is not acceptable despite the fact that the provider looked at a picture of
> the work area rather than examining it in person.  Based on your duties and
> responsibilities, further changes to your work station would not be appropriate.

*Id.*  Accordingly, Ms. Garrison ordered that Plaintiff return to her position by "Tuesday, January

9, 2001," and wrote that she would consider Plaintiff "Absent Without Leave" ("AWOL") if she

failed to report, which could lead to her removal.  *Id.*

Plaintiff, asserting that she was incapacitated, did not return to work on January 9, 2001,

as directed; instead, she remained AWOL until she unexpectedly showed up for work on March

8, 2001.  Def.'s Mot. for Summ. J., Ex. 21 (arbitrator's denial of Plaintiff's reinstatement) at 3.

On May 21, 2001, Ms. Linda Washington, the new Director of the ISS, issued a Notice of

Proposed Adverse Action to remove Plaintiff from employment with the Library based on

Plaintiff's extended AWOL status, which totaled 343 hours of AWOL.  Def.'s Stmt. ¶ 12; Def.'s

Mot. for Summ. J., Ex. 5.  Plaintiff was then removed from Library employment effective

January 18, 2002.  *Id.* ¶ 13; Def.'s Mot. for Summ. J., Ex. 6.  However, Plaintiff did not file an

allegation of discrimination with the Library's EEOCO within 20 workdays of her removal.  *Id.* ¶

14; Def.'s Mot. for Summ. J., Ex. 6 & Ex. 7.  Rather, Plaintiff filed an administrative appeal at or

around June 13, 2003, *see* Pl.'s Opp'n, Ex. 1 (Administrative Hearing Brief filed by Local 2477).

The removal of Plaintiff was sustained by a neutral third-party arbitrator in a decision dated

August 1, 2003.  *See* Def.'s Mot. for Summ. J., Ex. 21 (arbitrator's denial of Plaintiff's reinstatement).

As a result of these events, Plaintiff filed a six-count Second Amended Complaint with this Court in December 2003, charging that these actions taken on behalf of Defendant violated both Title VII and the ADA.  Count I alleges that the Library discriminated against Plaintiff in violation of Title VII and subjected her to "disparate treatment" based on her race (African-American) and her color (black) in (1) assigning her work; (2) taking disciplinary action against her; (3) denying her training opportunities; and (4) treating her differently with respect to "other terms and conditions of her employment."  *See* Second Am. Compl. ¶¶ 28-30 (Count I).  Count II asserts that the Library discriminated against Plaintiff in violation of Title VII on the basis of her race (African-American) and her color (black) in not promoting her from GS-5 to GS-6 in 1993 while promoting similarly situated Caucasian female employees from GS-5 to GS-6 status.  *Id.* ¶¶ 31-35 (Count II).  In Count III, Plaintiff contends that the library created a "hostile work environment" in violation of Title VII on the basis of her race (African-American) and her color (black) in (1) denying her training opportunities; (2) giving her "lower" performance appraisals; (3) subjecting her to unwarranted disciplinary actions; (4) using profanity directed towards her by her supervisor, Mr. Columbia; (5) removing the partitions from her work area in 1993; and (6) assigning her tasks that delayed the performance of her required duties.  *Id.* ¶¶ 31-35 (Count III).

Count IV alleges that the Library retaliated against Plaintiff for engaging in protected Title VII activity by (1) denying her a within-grade increase in 1995; (2) not giving Plaintiff cash awards; (3) removing the partitions from her office in 1993; and (4) pitting other employees against Plaintiff.  *Id.* ¶¶ 41-47 (Count IV).  Count V asserts that Plaintiff was disabled and was

regarded by the Library as disabled; based on this and other assumptions, it claims that the

Library failed to accommodate Plaintiff as required by the ADA by denying her request to be

placed in a draft-free work area as a reasonable accommodation for her degenerative lumbar disc

disability. *Id.* ¶¶ 48-53 (Count V).  Finally, Count VI alleges that the Library retaliated against

Plaintiff in violation of the ADA by (1) creating a hostile work environment; (2) failing to offer

Plaintiff the same or similar terms, conditions, and benefits of employment as it offered other

employees "who had not made such complaints"; (3) failing to accommodate Plaintiff's physical

handicap; and (4) discharging Plaintiff due to her complaints regarding discriminatory treatment

due to her disability. *Id.* ¶¶ 54-62 (Count VI).

## II:  LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears

the "initial responsibility of informing the district court of the basis for [its] motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings

and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file,

'designate' specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal

citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by

affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327). Accordingly, the Court reviews the defendant's motion for summary judgment under a "heightened standard" that reflects "special caution." *Aka*, 116 F.3d at 879 (internal quotations omitted). Nonetheless, while this special standard is more exacting, it is not inherently preclusive. Although more circumspect, the Court will continue to grant a motion for summary judgment in which the nonmoving party has failed to submit documents that create a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

### III: DISCUSSION

The Court shall commence its discussion of Defendant's Motion for Summary Judgment by analyzing Plaintiff's claims as they relate to two broad categories -- claims falling under Title VII, and claims falling under the strictures of the ADA.

A.      *Title VII Claims -- Counts I, II, III, and IV*

Upon a review of the allegations that make up Counts I (Disparate Treatment), II (Failure to Promote Due to Race and Color), III (Hostile Work Environment), and IV (Retaliation), Defendant's motion, Plaintiff's Opposition, Defendant's Reply, and all accompanying evidence

adduced upon discovery by the parties, it is quite clear that Plaintiff has failed (1) to establish a *prima facie* case of discrimination and reprisal for many of her claims; (2) to exhaust her administrative remedies for many of her claims, as required; (3) to show the required causation; and (4) to introduce a scintilla of evidence to support her remaining allegations. As such, summary judgment is appropriate vis-á-vis Counts I-IV of Plaintiff's Second Amended Complaint. The Court shall conduct an extensive examination of the piecemeal allegations tethered together in Counts I-IV in order to illuminate these many failings.

    1.    <u>Failure to Establish a *Prima Facie* Case</u>

    i.    *Standards*

Plaintiff brings this action pursuant to Title VII, which states that all personnel actions affecting employees "shall be made from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). It is uncontested that Plaintiff was an employee during the relevant time period and Defendant is an employer within the meaning of Title VII. The Court exercises jurisdiction over Plaintiff's claim according to 28 U.S.C. § 1331.

To prove a Title VII violation, Plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the employer were "more likely than not based on the consideration of impermissible factors" such as race or gender. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotation marks and citation omitted). Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting framework. *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). It is the district court's responsibility to closely

adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.  If she succeeds, the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for Plaintiff's non-selection, and to produce credible evidence supporting his claim.  *Id.*  Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").  As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L.Ed.2d 146 (2003); *see also Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations and quotation marks omitted).  At that point, Plaintiff has

the burden of persuasion to show that defendant's proffered reason was not the true reason for

the employment decision.  *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.  Pretext may be established

"directly by persuading the court that a discriminatory reason more likely motivated the employer

or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.*

at 256, 101 S.Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.  "Proof that the

defendant's explanation is unworthy of credence is simply one form of circumstantial evidence

that is probative of intentional discrimination, and it may be quite persuasive."  *Reeves*, 530 U.S.

at 147, 120 S.Ct. 2097 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517, 113 S.Ct. 2742)

("[P]roving the employer's reason false becomes part of (and often considerably assists) the

greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka*,

156 F.3d at 1290 ("[A] plaintiff's discrediting of an employer's stated reason for its employment

decision is entitled to considerable weight.").

 Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima

facie case, combined with sufficient evidence to find that the employer's justification is false,

may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Reeves*,

530 U.S. at 148, 120 S.Ct. 2097.  "[T]he trier of fact may still consider the evidence establishing

the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of

whether the defendant's explanation is pretextual."  *Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine*,

450 U.S. at 255 n.10, 101 S.Ct. 1089).  The Court of Appeals has distilled this analysis, noting

that the jury can infer discrimination from the combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack
> the employer's proffered explanation for its actions; and (3) any further evidence
> of discrimination that may be available to the plaintiff (such as independent

> evidence of discriminatory statements of attitudes on the part of the employer) or
> any contrary evidence that may be available to the employer (such as evidence of
> a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289.  However, evidence in each of the three categories is not required.  *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable

trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination,

summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*,

119 F.3d 23, 27-28 (D.C. Cir. 1997).  "[T]he court must consider all the evidence in its full

context in deciding whether the plaintiff has met his burden of showing that a reasonable jury

could conclude that he has suffered discrimination." *Aka*, 156 F.3d at 1290.

ii.     *Disparate Treatment*

In Count I of Plaintiff's Second Amended Complaint, Plaintiff alleges that Mr. Columbia,

her one-time supervisor at the Library, discriminated against her in violation of Title VII and

subjected her to "disparate treatment" based on her race (African-American) and her color

(black) in (1) assigning her work; (2) taking disciplinary action against her; (3) denying her

training opportunities; and (4) treating her differently with respect to "other terms and conditions

of her employment."  *See* Second Am. Compl. ¶¶ 28-30 (Count I).  To establish a *prima facie*

case of disparate-treatment race-based discrimination under Title VII, Plaintiff must show that:

(1) she is a member of a protected class; (2) she suffered adverse employment action; and (3) she

was treated differently from similarly-situated employees outside the protected class.  *See*

*Mitchell v. Baldrige*, 759 F.2d 80, 84 (D.C. Cir. 1985); *Douglas v. Pierce*, 707 F. Supp. 567, 571

(D.D.C. 1988), *aff'd*, 906 F.2d 783 (1990); *cf. Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir.

2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)); *Charles v. Nat'l Rehab.*

*Hosp.*, Civ. No. 94-0171, 1994 WL 874211, at *5 (D.D.C. Sept. 29, 1994); *Childers v. Slater*, 44

F. Supp. 2d 8, 18 (D.D.C. 2000), *vacated in part on other grounds*, 197 F.R.D. 185, 191 (D.D.C.

2000).

To establish an adverse employment action in the absence of a diminution in pay or

benefits, Plaintiff must show an action with "materially adverse consequences affecting the

terms, conditions, or privileges of employment." *Brody*, 199 F.3d at 457.  The employment

decision must inflict "objectively tangible harm." *Russell v. Principi*, 257 F.3d 815, 818 (D.C.

Cir. 2001) (recognizing that this requirement "guards against both judicial micromanagement of

business practices, and frivolous suits over insignificant slights") (internal quotation omitted).

"An employment decision does not rise to the level of an actionable adverse action . . . unless

there is a tangible change in the duties or working conditions constituting a material employment

disadvantage." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002); *see also Russell*, 257

F.3d at 818 ("[N]ot everything that makes an employee unhappy is an actionable adverse action.

Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did

not like would otherwise form the basis of a discrimination suit.") (citations and internal

quotation omitted).  "A tangible employment action constitutes a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits." *Burlington

Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Two of the allegations contained within Count I of Plaintiff's Second Amended

Complaint -- disparate treatment in the assignment of work and denial of training -- do not rise to

the level of an adverse employment action.  First, while Plaintiff asserts that she was treated

differently than "non-African American, non-Black employees in regard to the work assignments," Second Am. Compl. ¶ 29, neither her Complaint, her responses to Defendant's interrogatories, *see* Def.'s Mot. for Summ. J., Ex. 8, her responses to Defendant's request for production of documents, *id.*, Ex. 9, nor her deposition testimony taken in this matter, *id.*, Ex. 10, offer any facts to support this allegation. Indeed, Plaintiff fails to allege that Mr. Columbia's choices in the assignment of duties had any concrete negative impact on her whatsoever: nowhere does she claim a loss of pay or benefits resulting from any disparate assignment, and Plaintiff has failed to put forth even a scintilla of evidence before this Court indicating any adverse effect on her employment stemming from Mr. Columbia's choice of assignments. Moreover, when faced with these realities, Plaintiff, in her Opposition, remained utterly silent, and chose not to address the fact that she had pointed to no "objectively tangible harm" resulting from the quality or quantity of her assignments from Mr. Columbia. *See* Pl.'s Opp'n at 4-5; Def.'s Reply at 2-3. In the complete absence of any evidence pointing to adverse impact and tangible harm, Plaintiff cannot establish a *prima facie* case of discrimination in the assignment of duties to her.

Second, while Count I of Plaintiff's Second Amended Complaint also contends that she was treated differently than non-African-American employees in regard to her "training opportunities," Plaintiff has failed to introduce any evidence indicating how the denial of training opportunities inflicted any significant, tangible harm on her employment status. Indeed, all evidence indicates that Plaintiff's suffered no adverse employment action when her May 1994 training in "Ethics in Procurement" was cancelled due to her doctor's restrictions on walking, because (1) the training "was not critical to the performance of [her] job," Def.'s Stmt. ¶ 5, and

23

(2) shortly thereafter, Mr. Columbia was informed that Plaintiff's doctor had lifted her restriction on walking, and then approved the training for Plaintiff, *id.* Further, the cancellation of another training session by the Division Office in 1993 or 1994 due to a lack of funding also cannot constitute an adverse employment action, as "Plaintiff suffered no loss of pay or benefits, and no change in her duties, by having the training cancelled." *Id.* ¶ 6. Moreover, Plaintiff cannot show that she was "treated differently from similarly-situated employees outside the protected class" in regard to this training cancellation, as the across-the-board cancellation affected all potential attendees equally. Once again, when confronted with these facts, Plaintiff's cursory Opposition is entirely silent, and Plaintiff offers no evidence whatsoever in support of her allegation. *See* Pl.'s Opp'n at 4-5; Def.'s Reply at 3-4. As such, due to Plaintiff's failure to introduce any evidence as to how the rare denial of training opportunities[3] constituted either an adverse employment action or disparate treatment, Plaintiff cannot establish a *prima facie* case of discrimination in the training opportunities afforded to her by Mr. Columbia.

Upon a review, the only possible claim under Count I for which Plaintiff might meet the *prima facie* showing of discrimination is her allegation that Mr. Columbia subjected her to "disciplinary actions" due to disparate treatment arising out of her "race and color." *See* Second Am. Compl. ¶ 29 (Count I). Indeed, the *prima facie* basis for this assertion is even questionable, as all evidence indicates that the disciplinary action focused on by Plaintiff -- the Library's attempted removal of her in 1994 -- was ultimately unsuccessful, and produced no loss in pay or benefits. *See* Def.'s Stmt. ¶ 9. As a result of this attempted removal, Plaintiff experienced no

---

[3] One denial, of course, followed the instructions of Plaintiff's doctor and was actually an accommodation for Plaintiff.

"significant change" in her status as an employee and no permanent "materially adverse

consequences affecting the terms, conditions, or privileges of employment." *Brody*, 199 F.3d at

457.  However, for the purposes of argument, the Court shall assume that an unsuccessful

adverse employment action -- i.e., the attempted removal of Plaintiff -- could have produced an

important, though temporary, change in the terms, conditions, and privileges of her employment

with the Library.  As such, the Court shall continue with its analysis of this sole remaining

allegation under Count I under the rest of the *McDonnell Douglas* test at a later point in this

Memorandum Opinion.  *See infra* Section III(A)(4)(i).

iii.    *Retaliation*

Count IV of Plaintiff's Second Amended Complaint alleges that the Library retaliated

against her for engaging in protected Title VII activity by (1) denying her a within-grade increase

in 1995; (2) not giving Plaintiff cash awards; (3) removing the partitions from her office in 1993;

and (4) pitting other employees against Plaintiff.  *Id.* ¶¶ 41-47 (Count IV).  Title VII not only

prohibits federal agencies from discriminating on the basis of race, 42 U.S.C. § 2000e-16, it also

prohibits them from retaliating against employees for the assertion of their rights under Title VII.

*See Forman v. Small*, 271 F.3d 285, 297 (D.C. Cir. 2001), *cert. denied*, 536 U.S. 958, 122 S.Ct.

2661, 153 L.Ed.2d 836 (2002).  To establish a *prima facie* case of retaliation, Plaintiff must show

that: (1) she engaged in a statutorily protected activity; (2) the employer took an adverse

personnel action; and (3) a causal connection exists between the protected activity and the

adverse action.  *See Morgan*, 328 F.3d at 651; *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir.

1999).  "A common element required for discrimination and retaliation claims against federal

employers, and private employers, is thus some form of legally cognizable adverse action by the

employer." *Brody*, 199 F.3d at 452.

Once again, many of Plaintiff's allegations falling under the umbrella of Count IV are simply insufficient to constitute "adverse personnel actions." First, Count IV contends that "she was retaliated against by Mr. Columbia," Second Am. Compl. ¶ 43, after "she complained both formally and informally in good faith to Defendant regarding Mr. Columbia's discriminatory treatment of her," *id.* ¶ 42, when he "removed her partitions in October 1993," *id.* ¶ 43. It is uncontested that Plaintiff's pay and the nature of her work remained unchanged as a result of the temporary erection and the eventual removal (due to security concerns) of the partitions a short time later. *See* Def.'s Stmt. ¶ 3; Def.'s Mot. for Summ. J., Ex. 1 (Columbia Decl.) at ¶¶ 2-5, 1. When confronted with the fact that neutral, security-based decisions regarding the propriety of her partitions are insufficient to constitute a "tangible change in the duties or working conditions constituting a material employment disadvantage," *Stewart*, 275 F.3d at 1134, Plaintiff -- in her Opposition -- remains completely silent, and essentially abandons this assertion. *See* Pl.'s Opp'n at 4-5. As such, in the complete absence of any evidence showing a material, adverse impact, Plaintiff is unable to establish a *prima facie* case of retaliation in the removal of the partitions that briefly surrounded her workspace in 1993.

Second, Plaintiff's contention under Count IV that Mr. Columbia, because of retaliatory motivations, "caused a hostile work environment between Plaintiff and her fellow employees, by pitting other employees against Plaintiff," Second Am. Compl. ¶ 43, also fails due the fact that the conduct -- even if true -- does not rise to the level of an adverse employment action. "The fact that plaintiff believes she was getting the cold shoulder from her co-workers does not constitute a materially adverse consequence or disadvantage in the terms and conditions or her

employment so as to establish an adverse personnel action." *Roberts v. Segal Co.*, 125 F. Supp. 2d 545, 549 (D.D.C. 2000); *Raymond v. U.S. Capitol Police Bd.*, 157 F. Supp. 2d 50, 59 (D.D.C. 2001) (same); *Williams v. City of Kansas City*, 223 F.3d 749, 754 (8th Cir. 2000) ("[Defendant's] silent treatment [of plaintiff] is at most ostracism, which does not rise to the level of an actionable adverse employment action."); *Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 869 (9th Cir. 1996) ("[M]ere ostracism in the workplace is not enough to show an adverse employment action."); *Brooks v. San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) (noting both that "badmouthing an employee outside the job reference context" does not constitute an adverse employment action, and that "holding an employer liable because employees refuse to associate with each other might well be unconstitutional").  Accordingly, Plaintiff cannot maintain a retaliation claim based on an assertion that Mr. Columbia somehow "pitted other employees against" her.

Therefore, the only allegations contained within Count IV that possibly meet the *prima facie* requirements of retaliation are Plaintiff's remaining assertions that  Mr. Columbia (1) denied her a within-grade increase in 1995; and (2) failed to give her cash awards.  *Id.* ¶¶ 41-47 (Count IV).  The Court shall continue with its analysis of these remaining allegations under Count IV at a later point in this Memorandum Opinion.  *See infra* Section III(A)(3); Section III(A)(4)(iii).

### 2.    Failure to Exhaust Administrative Remedies

#### i.    *Standards*

Federal employees may file a civil action only after exhausting their administrative remedies before the concerned federal agency.  42 U.S.C. § 2000e-16(c).  Under rulemaking

authority delegated by Title VII, *see* 42 U.S.C. § 2000e-16(b), the Librarian of Congress

exercises authority granted to the Equal Employment Opportunity Commission.  In accordance

with that statute, the Library of Congress promulgated Library of Congress Regulation ("LCR")

2010-3.1 on April 20, 1983 -- "Resolution of Problems, Complaints, and Charges of

Discrimination in Library Employment and Staff Relations Under the Equal Employment

Opportunity Program."  *See* Def.'s Mot. for Summ. J., Ex. 11.  Pursuant to Section 4(A) of LCR

2010-3.1 ("Precomplaint Procedures"), "[a] staff member, or qualified applicant, who believes

that he/she has been, or is being, discriminated against, and who wishes to resolve the matter,

shall notify and consult with a Counselor not later than 20 workdays after the date of the alleged

discriminatory matter." *Id.*

Compliance with these procedures and time limits is mandatory.  "Complainants must

timely exhaust these administrative remedies before bringing their claims to court." *Bowden v.*

*United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *Bayer v. Dep't of Treasury*, 956 F.2d 330,

332 (D.C. Cir. 1992); *Williams v. Munoz*, 106 F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely

administrative charge is a prerequisite to initiation of a Title VII action").  "Because untimely

exhaustion of administrative remedies is an affirmative defense, the defendant bears the

responsibility of pleading and proving it." *Id.* at 437 (citing *Brown v. Marsh*, 777 F.2d 8, 13

(D.C. Cir. 1985)); *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95-96, 111 S.Ct. 453,

112 L.Ed.2d 435 (1990).  Importantly, the administrative deadlines imposed by this scheme are

not jurisdictional in nature:  "they function like a statute of limitations and like a statute of

limitations, are subject to waiver, estoppel, and equitable tolling." *Marsh*, 777 F.2d at 14

(citations omitted).

In Count II of the Complaint, Plaintiff alleges that the Library discriminated against her in violation of Title VII on the basis of her race (African-American) and her color (black) in not promoting her from GS-5 to GS-6 in 1993 while promoting similarly situated Caucasian female employees from GS-5 to GS-6 status.  *Id.* ¶¶ 31-35 (Count II).  In support of this assertion, Plaintiff contends that she was a GS-5 typing clerk, and that she and two (2) other African-American females were not promoted to GS-6 status until "much later" than three (3) white females performing the same or similar work.  *Id.*  Her Second Amended Complaint identifies these three (3) white females as Morgan Day, Charlotte Logan, and Melissa Stevenski.  *Id.* ¶¶ 12-14.  In her deposition, Plaintiff identified a fourth white female -- April Sliwinski -- whom Plaintiff claimed was also promoted to GS-6 status while performing the same or similar work.[4]

Problematically for Plaintiff, she did not file an allegation of discrimination as to any of these selections within 20 workdays of the discriminatory event as required by LCR 2010-3.1. Importantly, Ms. Morgan Day was chosen for a GS-6 Procurement Clerk position under an open vacancy announcement for that position in December 1991.  Def.'s Motion for Summ. J., Ex. 12. Ms. Charlotte Logan was selected for a GS-6 Supply Technician under an open vacancy in June 1992.  *Id.*, Ex. 13.  Ms. Melissa Stevenski was promoted to a GS-6 Procurement Clerk position under an open vacancy announcement for that position in December 1991, *id.*, Ex. 14, and then temporarily promoted to a GS-7 Contract and Procurement Specialist position from July 1993 to October 1993, whereupon she returned to her GS-6 Procurement Clerk position.  *Id.*, Ex. 15 &

---

[4] Plaintiff's assertion is factually inaccurate.  Ms. April Sliwinski was temporarily promoted from a GS-4 Supply Clerk to a GS-5 Supply Clerk in December 1993 -- the same level as Plaintiff.  Def.'s Mot. for Summ. J., Ex. 17 & 18.  Plaintiff has presented no contrary evidence.

16.  Finally, Ms. April Sliwinski was temporarily promoted from a GS-4 Supply Clerk to a GS-5

Supply Clerk in December 1993.  *Id.*, Ex. 17 & 18.

Plaintiff filed only one EEO allegation regarding any of these promotions:  an "Allegation

of Discrimination" on August 6, 1993.  *See id.*, Ex. 19.  As such, the allegation occurred well

after the promotions of Ms. Day and Ms. Logan, and well before the temporary promotion of Ms.

Sliwinski.  Any claims now made by Plaintiff vis-á-vis these promotions are certainly untimely,

as Plaintiff failed to exhaust her administrative remedies or timely file complaints.  Any

allegation of discrimination concerning Ms. Stevenski's December 1991 promotion to GS-6

status is also untimely, as Plaintiff failed to comply with LCR 2010-3.1.  Plaintiff's August 6,

1993 "Allegation of Discrimination" can only be considered timely for one promotion -- Ms.

Stevenski's temporary promotion to a GS-7 Contract and Procurement Specialist position from

July 1993 to October 1993.  However, Plaintiff's subsequent "Complaint of Discrimination,"

filed on July 26, 1994, makes it clear that she was only complaining of promotions to the GS-6

level.  *See id.*, Ex. 19a (Item 7).  Accordingly, this temporary promotion falls outside of

Plaintiff's true complaints, and any retrospective attempt to revive a claim regarding Ms.

Stevenski's temporary promotion is untimely as well.

In sum, Plaintiff was required by LCR 2010-3.1 to "notify and consult with a Counselor

not later than 20 workdays after the date of the alleged discriminatory matter."  *Id.*, Ex. 11.  In

the present case, Plaintiff has neither alleged nor presented any evidence indicating that she

actually applied for any of these identified vacancies.  Nor has Plaintiff presented any evidence

indicating that she was as qualified, or better qualified, than the four identified Caucasian

females.  With no immediate interest in these positions, Plaintiff alleges no definite harm or

adverse employment action other than some sort of vague, metaphysical "discrimination."
Moreover, such allegations of discrimination in her one "Allegation of Discrimination" filed on
August 6, 1993 concerning events in December 1991, June 1992, and December 1993 were
clearly untimely.  When confronted with these failings, Plaintiff, in her Opposition, once again
remains silent, refusing to address the timeliness issue and effectively conceding her
noncompliance.  Having presented no equitable arguments regarding waiver, estoppel, or
equitable tolling, the Court has no choice but to conclude that the allegations of discrimination in
non-promotion contained within Count II of Plaintiff's Second Amended Complaint must be
dismissed as untimely.

3.    <u>Failure to Establish the Necessary Causation</u>

As noted previously, *supra* Section III(A)(1)(iii), the only allegations contained within
Count IV that could possibly meet the *prima facie* requirements of retaliation are Plaintiff's
remaining assertions that Mr. Columbia (1) denied her a within-grade increase in 1995; and (2)
failed to give her cash awards. *Id.* ¶¶ 41-47 (Count IV).  However, one of these remaining claims
of retaliation -- the denial of a within-grade increase in 1995 -- must also be dismissed, as
Plaintiff cannot establish the necessary causation in the complained-of actions.

To establish a *prima facie* case of retaliation, Plaintiff must show that (1) she engaged in
statutorily protected activity; (2) the Library took an adverse personnel action; and (3) that a
causal connection existed between the two.  *See Jones v. Washington Metro Area Transit Auth.*,
205 F.3d 428, 433 (D.C. Cir. 2000).  As discussed previously, Plaintiff's allegation regarding
alleged retaliation in the removal of her partitions does not meet the *prima facie* requirements for
retaliation because it did not constitute an adverse employment action -- thereby failing the

31

second prong of the *prima facie* test.  *See supra* Section III(A)(1)(iii).  However, Plaintiff cannot

establish the third prong of the *prima facie* case -- the "causal connection" requirement -- with

regard to her assertion that Mr. Columbia denied her a within-grade increase in 1995 based on

retaliatory motives.  To prove a causal connection, Plaintiff must make a "showing that the

employer had knowledge of the employee's protected activity, and that the adverse personnel

action took place shortly after that activity."  *Mitchell*, 759 F.2d at 86; *see also Grant v.*

*Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) ("[C]ourts have recognized that proof of

causal connection can be established indirectly by showing that discriminatory activity is

followed by discriminatory treatment.").

Plaintiff has presented absolutely no direct evidence showing a causal connection

between her EEO "Allegation of Discrimination" on August 6, 1993, and her EEO "Complaint of

Discrimination" on July 26, 1994, and the denial of a within-grade increase in 1995.  Indeed,

Plaintiff has presented no argument whatsoever in regard to causation, once again choosing to

remain silent in her Opposition and effectively conceding the argument to the Library.  *See*

*generally* Pl.'s Opp'n.  While Plaintiff has not offered such an argument, even assuming

*arguendo* that Plaintiff had sought to imply a retaliatory motive through proximity, her attempt

would have failed as to these two allegations.

Importantly, "[t]he cases that accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action as sufficient evidence of

causality to establish a prima face case uniformly hold that the temporal proximity must be 'very

close.'"  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  Courts have generally

accepted time periods of a few days up to a few months, and have seldom accepted time lapses

outside of a year in length. *See Brodetski*, 141 F. Supp. 2d at 43. The District Court for the District of Columbia has held that a matter of weeks, and of three to five months is a short enough time lapse between the protected activity and the alleged retaliatory conduct to establish a causal connection. *See, e.g.*, *Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2, 3-4 (D.D.C. 1989) (holding that five weeks constituted a short enough time lapse to establish a causal connection); *Castle v. Bentsen*, 867 F. Supp. 1, 3 (D.D.C. 1994) (holding that three to five months is a short enough time lapse between EEO activity and reprisal to establish a causal connection), *aff'd*, 78 F.3d 654 (D.C. Cir. 1996). However, courts within this Circuit have also found that time lapses of greater length negate any inference that a causal connection exists between the protected activity and the complained-of action. *See, e.g.*, *MECO Corp. v. Nat'l Labor Relations Bd.*, 986 F.2d 1434, 1437 (D.C. Cir. 1993) (citing various cases noting that gaps of four-to-eight months were insufficient to support an inference of causation in a similar setting); *Devera v. Adams*, 874 F. Supp. 17, 21 (D.D.C. 1995) (holding that "an eight month interval between the two events is not strongly suggestive of a causal link"), *aff'd*, 1997 WL 404898 (D.C. Cir. June 5, 1997); *Garrett v. Lujan*, 799 F. Supp. 198, 202 (D.D.C. 1992) (holding that almost a year "between plaintiff's EEO activity and the adverse employment decision is too great [a length of time] to support an inference of reprisal"); *Townsend v. Washington Metro Airport Auth.*, 746 F. Supp. 178, 187 (D.D.C. 1990) (two year gap insufficient to create inference); *Forman v. Small*, 271 F.3d 285, 301 (D.C. Cir. 2001) (three year lapse insufficient to support inference of causation). Accordingly, the greater the time that has elapsed between the protected activity and the alleged acts of discrimination, the more difficult it is for a complainant to justify an inference of causal connection between the two. *See Saunders v. DiMario*, Civ. No. 97-1002, 1998 WL 525798, at

*5 (D.D.C. Aug. 14, 1998) (citing cases).

With regard to Plaintiff's denial of a within-grade increase, Plaintiff filed her initial EEO complaint in August 1993.  Mr. Columbia first notified Plaintiff in December 1994 that she risked being denied a within-grade increase if her work did not improve, *see* Def.'s Mot. for Summ. J., Ex. 4, and then actually denied the within-grade increase in March 1995, *id.*, Ex. 5; Def.'s Stmt. ¶ 10.  This gap of sixteen (16) to nearly twenty (20) months is simply too great to support an inference that Mr. Columbia denied Plaintiff's within-grade increase out of retaliatory motives.  Without any other evidence of retaliation, either direct or indirect as to this claim, the lack of temporal proximity proves fatal to Plaintiff's allegation within Count IV that Mr. Columbia engaged in retaliation in violation of Title VII when he denied her within-grade increase in March 1995.  Accordingly, the only claim left standing under Count IV is Plaintiff's allegation that, due to Mr. Columbia's retaliatory motives and influence within the C&L, the Library failed to give her unspecified cash awards at unidentified times.  *Id.* ¶¶ 41-47 (Count IV).

4.      Failure to Produce Any Evidence in Support of Her Unsubstantiated Allegations

At this point, it would be helpful to review what claims, if any, Plaintiff still has pursuant to her Title VII allegations in Counts I-IV of her Second Amended Complaint.  As to Count I, the assertion of disparate treatment, the only allegation left standing for which Plaintiff might be able to show a *prima facie* case of discrimination is her assertion that Mr. Columbia tried -- and failed -- to discipline her for race-based reasons.  *See* Second Am. Compl. ¶ 29; *supra* Section III(A)(1)(ii).  Count II, Plaintiff's argument that the Library failed to promote her for certain positions because of her race and color, has been dismissed due to Plaintiff's failure to exhaust

her administrative remedies, as required.  *See supra* Section III(A)(2).  Count III, Plaintiff's

allegation of a hostile work environment, is still before this Court.  Finally, out of Count IV,

Plaintiff's Title VII retaliation allegation, the remaining claim is Plaintiff's argument that the

Library failed to give her unspecified cash awards at unidentified times.  *Id.* ¶¶ 41-47 (Count IV);

*supra* Section III(A)(1)(iii) & (A)(3).  The Court shall analyze each of these remaining claims,

and highlight why dismissal of all Counts asserting violations of Title VII is warranted under the

*McDonnell Douglas* test.

i.    *Count I -- Discipline*

The only claim remaining under Count I of Plaintiff's Second Amended Complaint

(Disparate Treatment) is Plaintiff's allegation that Mr. Columbia tried -- and failed -- to

discipline her for race-based reasons.  *See* Second Am. Compl. ¶ 29; *supra* Section III(A)(1)(ii).

Assuming for the moment that such an assertion is sufficient to constitute a *prima facie* case of

discrimination, the *McDonnell Douglas* framework shifts the burden to the Library to articulate

some legitimate, non-discriminatory reason for this action.  *See McDonnell Douglas*, 411 U.S. at

802, 93 S.Ct. 1817.

Here, the Library has presented substantial evidence indicating that Ms. Kay Klinker,

Plaintiff's then-supervisor, proposed that Plaintiff be suspended without pay for ten days because

of insubordination in April 1994.  Def.'s Stmt. ¶ 7; Def.'s Mot. for Summ. J., Ex. 7.  Once he

became Plaintiff's immediate supervisor, Mr. Columbia, in October 1994, sought to remove

Plaintiff from employment with the Library due to (1) her failure to attend meetings, despite

written directives to attend such meetings; (2) poor job performance; (3) her refusal to complete

two critical projects; and (4) her persistently uncooperative attitude, insubordination, and

35

misconduct.  *Id.* ¶ 8; Def.'s Mot. for Summ. J., Ex. 1 (Columbia Decl.) at ¶¶ 9-10, 2.  While an arbitrator ultimately denied Mr. Columbia's attempted discipline and removal of Plaintiff, he did explicitly find -- both in his Award and in his denial of the labor organization's request for attorney's fees -- that the Library acted reasonably and for cause in attempting to permanently remove Plaintiff.  *Id.* ¶ 9; Def.'s Mot. for Summ. J., Ex. 3.  As such, the Library has clearly met its obligations under the *McDonnell Douglas* test and presented numerous legitimate, non-discriminatory reasons for the attempted discipline of Plaintiff backed by solid evidence.

At this point, Plaintiff has the burden of persuasion to show that the Library's proffered reasons for her attempted removal were not the true reasons for the employment decision.  *See Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.  Here, Plaintiff simply drops the ball.  She presents no argument or evidence indicating that the Library's stated reasons behind her attempted removal were anything other than legitimate.  Indeed, in her Opposition, Plaintiff simply fails to address this claim, effectively conceding the argument.  *See generally* Pl.'s Opp'n.  Upon a review of the factors identified in the *Aka* decision, Plaintiff (1) has a minimal, at best, *prima facie* case on this claim; (2) no evidence attacking the employer's proffered reasons for its actions; and (3) no further available evidence of discrimination.  *See Aka*, 156 F.3d at 1289.  As such, Plaintiff has failed to meet her burden of showing that a reasonable jury could conclude that she has suffered discrimination via disparate treatment.  *Id.* at 1290.  Given this dearth of evidence, summary judgment in favor of the Library on Count I of Plaintiff's Second Amended Complaint is appropriate.

ii.      *Counts III -- Hostile Work Environment*

Count III of Plaintiff's Second Amended Complaint alleges that Mr. Columbia "created

36

and maintained a hostile work environment for Plaintiff because of her race and color."  Second Am. Compl. ¶ 36 (Count III).  Specifically, in Count III, Plaintiff contends that the library created a "hostile work environment" by (1) denying her training opportunities; (2) giving her "lower" performance appraisals; (3) subjecting her to unwarranted disciplinary actions; (4) using profanity directed towards her by her supervisor, Mr. Columbia; (5) removing the partitions from her work area in 1993; and (6) assigning her tasks that delayed the performance of her required duties.  *Id.* ¶¶ 31-35 (Count III).

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "Terms, conditions, or privileges" encompass tangible as well as psychological harm.  *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).  In addition, the Supreme Court has held that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct.367, 126 L.Ed.2d 295 (1993) (quotation omitted).

To establish a claim of a hostile work environment based on race, a plaintiff must demonstrate:  "'(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.'"  *Raymond*, 157 F. Supp.

2d at 57 (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996)).  In

determining whether a hostile work environment exists, the Supreme Court has directed the

courts to look at the totality of the circumstances, including "'the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."

*Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)

(quoting *Harris*, 510 U.S. at 23, 114 S.Ct.367).  While the plaintiff is not required to plead a

*prima facie* case of hostile work environment in the complaint, the alleged facts must be able to

support such a claim.  *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir.

2000).  In addition, the Supreme Court has circumscribed the definition of a hostile work

environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure

that Title VII does not become a 'general civility code.'"  *Faragher*, 524 U.S. at 788, 118 S.Ct.

2275 (citations omitted).

　　　In the instant case, Plaintiff's claim of a hostile work environment is not supported even

by a scintilla of evidence.  Upon an analysis of all evidence currently before this Court, it is clear

that the evidence shows that while one of Plaintiff's training sessions was cancelled because of a

lack of funding and another delayed due to her doctor's orders, Def.'s Stmt. ¶ 6, Def.'s Mot. for

Summ. J., Ex. 1 (Columbia Decl.) at ¶ 8, 2, Plaintiff herself acknowledges that she was still able

to take "many" training courses while employed at the Library.  *See* Def.'s Mot. for Summ. J.,

Ex. 10 (Nichols' Dep.) at 76.  While Plaintiff alleges one "satisfactory" performance evaluation

she received from Mr. Columbia contributed to a hostile work environment based on her race,

Second Am. Compl. ¶¶ 15-16, this onetime event was certainly not severe, pervasive, physically

threatening, humiliating, or offensive.  Furthermore, Plaintiff's claim that she was subjected to unwarranted disciplinary action by Mr. Columbia as part of a hostile work environment is belied by the facts.  Mr. Columbia proposed one unsuccessful adverse action against Plaintiff in late 1994 through early 1995; while this action was overturned, the finder of fact explicitly concluded that the adverse action was warranted.  Def.'s Mot. for Summ. J., Ex. 3.  Moreover, Plaintiff has adduced no evidence whatsoever in the record in support of her assertion in her Complaint that Mr. Columbia created a hostile work environment by subjecting her to profanity.  *See* Second Am. Compl. ¶ 38.  Finally, the onetime removal of Plaintiff's work partitions in 1993 was certainly not severe, physically threatening, humiliating, or offensive.

Perhaps realizing the sheer dearth of evidence supporting her allegations in Count III, Plaintiff attempts to use her Opposition as an opportunity to run away from the statements made in her Second Amended Complaint and re-characterize her hostile work environment claim.  *See* Pl.'s Opp'n at 5.  Apparently conceding her hostile work environment arising out of race claim, which she never defends, *id.*, Plaintiff now claims a hostile work environment because of a disability, *id.*  Plaintiff points to two actions by the Library that constituted "severe and pervasive" conduct:  (1) her supervisor, Ms. Linda Garrison, said that she could remain on leave without pay until she "overcame her incapacitation," and (2) her supervisor, Mr. Columbia, had partitions removed from her work area, "exacerat[ing] her pre-existing condition, causing unnecessary strain to her back while knowing she suffered from a lumbar disc injury."  *Id.*

Even accepting this remarkable re-write of Plaintiff's factual allegations, summary judgment is still warranted as to Count III for three reasons.  First, Plaintiff simply fails to explain how her supervisor's alleged agreement to allow her to remain on leave without pay

contributed to a hostile work environment.  Second, the onetime removal of Plaintiff's partitions

was certainly not evidence of frequent, severe discriminatory conduct that was physically

threatening or humiliating, and that unreasonably interfered with her work performance as a

receptionist.  Third, in her Complaint, Plaintiff noted that she "was diagnosed with degenerative

lumbar disc disease" "[a]fter he transfer to ISS," Second Am. Compl. ¶ 24 -- i.e., in July 1996,

*id.* ¶ 21.  At this time, "[b]ecause of this disease, Plaintiff's treating physician permanently

restricted her from exposure to air drafts."  *Id.* ¶ 24.  However, the partitions were removed from

her work by Mr. Columbia in October 1993.  *Id.* ¶ 17; Def.'s Stmt. ¶¶ 1-2.  As such, the removal

of the partitions from her work area could not have been related to her alleged impairment

because that impairment was not diagnosed until three (3) years after the partitions were

removed.  It is impossible for the removal of the partitions in 1993 to contribute to a hostile work

environment that, by Plaintiff's own allegations, did not fully arise until after 1996.  Moreover,

all evidence indicates that once notified, the Library undertook

> substantial ameliorative efforts to abate the 'draft' problem, including enclosing
> [Plaintiff's] workspace with glass partitions, providing a space heater, disabling
> the air vents within [Plaintiff's] workspace, and testing the partitioned area to
> ensure that it complied with applicable regulations regarding temperature, air
> flow, and humidity.

Def.'s Mot. for Summ. J., Ex. 21 (arbitrator's denial of Plaintiff's reinstatement) at 2.

Accordingly, Plaintiff has presented no evidence supporting the claims of race-based

hostile work environment created by Mr. Columbia, as set out in Count III of her Second

Amended Complaint.  After running away from these allegations in her Opposition, Plaintiff's

new assertions of a hostile work environment arising out of her alleged disability are equally ill-

founded, backed by no evidence and contradicted by both reason and all information before this

Court.  Given these many failings, summary judgment as to Count III of Plaintiff's Second Amended Complaint is appropriate.

iii.      *Count IV -- Denial of Cash Awards*

Out of Count IV (Retaliation) -- Plaintiff's assertion that Mr. Columbia retaliated against her in violation of Title VII -- the only claim currently left standing is Plaintiff's argument that the Library failed to give her unspecified cash awards at unidentified times.  *Id.* ¶¶ 41-47 (Count IV); *supra* Section III(A)(1)(iii) & (A)(3).  However, given the lack of specificity within Plaintiff's Second Amended Complaint as to this allegation, the failure of Plaintiff to attach any supporting evidence to her Opposition, and Plaintiff's utter neglect of this contention in her Opposition, it is unclear exactly when or how Mr. Columbia "failed to grant [Plaintiff] cash awards."  *Id.* ¶ 43.  The only remotely applicable evidence of the Library's denial of salary or benefits to Plaintiff that is currently before the Court is the fact that Mr. Columbia denied Plaintiff a within-grade increase in March 1995.  Def.'s Stmt. ¶ 10; Def.'s Mot. for Summ. J., Ex. 1 (Columbia Decl.) ¶ 10, 2.  As discussed previously, Plaintiff fails to establish the causation necessary to support the within-grade increase claim.  *See supra* Section III(A)(3).  However, the 1995 within-grade denial cannot be what Plaintiff complains of when she focuses on Mr. Columbia's alleged failure to "grant her cash awards" because the same paragraph of her Second Amended Complaint -- Paragraph 43 -- mentions both in the same breadth.

Because the "cash awards" specified by the Plaintiff in her Second Amended Complaint are wholly unrelated to the 1995 within-grade denial made at the suggestion of Mr. Columbia, the Court conducted a searching review of all evidence before it in order to determine exactly what "cash awards" Plaintiff references.  Plaintiff provides no argument or evidence in her

41

Opposition in support of this claim, and -- yet again -- essentially abandons this remaining

allegation contained in Count IV.  Upon its own review of the record, the Court finds no

evidence indicating that Mr. Columbia denied Plaintiff "cash awards," or that any such denial

would have been based on retaliatory motivations due to Plaintiff's exercise of the EEO

Complaint system.  As such, given that Plaintiff has produced no evidence in support of her

"denial of cash awards" claim, Plaintiff cannot avoid summary judgment as to the whole of

Count IV, her retaliation allegation.

      B.      *ADA Claims -- Counts V & VI*

      The two remaining Counts of Plaintiff's Second Amended Complaint reference alleged

violations of the ADA by the Library.  Count V asserts that Plaintiff was disabled and was

regarded by the Library as disabled; based on this and other assumptions, it contends that the

Library failed to accommodate Plaintiff as required by the ADA by denying her 1997 request to

be placed in a draft-free work area as a reasonable accommodation for her degenerative lumbar

disc disability.  *Id.* ¶¶ 48-53 (Count V).  Count VI contends that the Library retaliated against

Plaintiff in violation of the ADA by (1) creating a hostile work environment; (2) failing to offer

Plaintiff the same or similar terms, conditions, and benefits of employment as it offered other

employees "who had not made such complaints"; (3) failing to accommodate Plaintiff's physical

handicap; and (4) discharging Plaintiff due to her complaints regarding discriminatory treatment

due to her disability.  *Id.* ¶¶ 54-62 (Count VI).  Two major problems exist that thwart Plaintiff's

ADA claims, and make appropriate summary judgment in favor of the Library.

1.    Failure to Exhaust Administrative Remedies

In Count VI of her Second Amended Complaint, Plaintiff asserts that the Library engaged in retaliation in violation of the ADA after she "engaged in statutorily protected activity when she complained in good faith to Defendant regarding discriminatory treatment." *See id.* ¶ 55.  Upon receipt of her alleged complaint, Plaintiff contends that the Library engaged in an escalating series of retaliatory actions, beginning by creating a hostile work environment, then failing to accommodate her asserted physical handicap, and then discharging her from employment due to her complaints of disability-based discrimination.  *See id.* ¶¶ 56-58.

"Before bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving that agency a chance to act on it." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (citing 42 U.S.C. § 12117(a); *Park v. Howard Univ.*, 71 F.3d 904, 907-09 (D.C. Cir. 1995)).  Moreover, a vague or circumscribed EEOC charge will not satisfy the exhaustion requirement for claims that it does not fairly embrace.  *Id.*  "'Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party notice of the charge, as surely as would an initial failure to file a timely EEOC charge.'"  *Id.* (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989)).  While every detail of the eventual complaint need not be presaged in the EEOC filing, the substance of the ADA claim must fall within the scope of "the administrative investigation that can reasonably be expected to follow the charge of discrimination."  *Park*, 71 F.3d at 907 (citation and internal punctuation omitted).

Problematically for Plaintiff's Count VI, Plaintiff was terminated effective January 18, 2002.  *See* Def.'s Mot. for Summ. J., Ex. 6.  However, Plaintiff did not file an allegation regarding her removal with the Library's EEOCO.  *Id.*, Ex. 7.  Rather, Plaintiff's union filed a grievance over one (1) year later in 2003, and -- after an evidentiary hearing on April 22, 2003 -- an arbitrator ultimately issued a ruling on August 1, 2003.  *See* Pl.'s Notice of Filing, Attach. 1 (Post-Hearing Brief of the Union) at 1; Def.'s Mot. for Summ. J., Ex. 21 (arbitrator's denial of Plaintiff's reinstatement) at 1.  As such, Plaintiff did not pursue her remedy until she filed her Second Amended Complaint before this Court in December 2003.  Plaintiff's actions were procedurally inappropriate, as the D.C. Circuit explained in *Johnson v. Peterson*, 996 F.2d 397 (D.C. Cir. 1993):

> [S]ection 7121(d) requires a federal employee with a pure discrimination complaint to choose between the statutory and the negotiated grievance procedures.  The employee who chooses the negotiated procedure may appeal the arbitrator's decision to the EEOC.  Only after the EEOC has rendered a decision or failed to do so within 180 days may the employee use section 2000e-16(c) and initiate suit in district court.  After the arbitrator ruled against them, [plaintiffs] attempted to bring suit in district court without first appealing to the EEOC.  They failed to exhaust their administrative remedies and, as a consequence, their lawsuit was properly dismissed by the district court.

*Id.* at 401.  When faced with these failings, Plaintiff, in her Opposition, remains completely silent, and essentially abandons her position.  Because it is uncontested that Plaintiff failed to comply with LCR 2010-3.1 and did not pursue her administrative remedies regarding her ADA retaliation claim by either filing a timely complaint with the EEOC or appealing the arbitrator's decision to the EEOC, dismissal of Count VI of Plaintiff's Second Amended Complaint is appropriate.

2.      Inability to Establish Failure to Accommodate

Count V of Plaintiff's Second Amended Complaint alleges that the Library failed to reasonably accommodate Plaintiff's disability -- lumbar disc syndrome -- by reducing the exposure to air drafts in her work space for the ISS/Parking Program.  *See* Second Am. Compl. ¶¶ 48-53.  Under the ADA, 104 Stat. 328, 42 U.S.C. § 12101 *et seq.* (1994 ed. and Supp. V.), discrimination by a covered employer against a "qualified individual with a disability" is strictly prohibited.  *See* 42 U.S.C. § 12112(a).  The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id.* § 23111(8).  A "disability" is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  *Id.* § 12102(2).  It is the burden of the plaintiff to prove that he or she is disabled.  *See Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004); *Swanks v. Washington Metro. Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 1999).

The ADA defines discrimination to include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business[.]"  *Id.* § 12112(b)(5)(A).  "Under the ADA's scheme, then, it is discriminatory for a covered employer to decline to take reasonable steps to accommodate an employee's disability, unless the steps in question 'would impose an undue hardship[.]"  *Aka*, 156 F.3d at 1300.  To establish a *prima facie*

45

case for failure to accommodate under the ADA, a plaintiff must show: "'(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.'" *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002) (quoting *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).  If such evidence is produced, it is up to the employer to submit rebuttal evidence; the ultimate burden, however, remains with the Plaintiff.  *Barth v. Gelb*, 2 F.3d 1180, 1185-86 (D.C. Cir. 1993) (explaining that the *McDonnell Douglas* framework is not proper for reasonable accommodation claims, and that such claims can be tested through the "application of traditional burdens of proof").

The Library spends the vast portion of its argument on the contention that Plaintiff's ADA claims merit dismissal because, given the evidence before the Court, she cannot establish that she was a "qualified individual" within the meaning of the ADA.  *See* Def.'s Mot. for Summ. J. at 16-19; Def.'s Reply at 6-7.  The Library's central argument is that Plaintiff's alleged impairment did not impact a "major life activity," a fact supported even by the testimony of her treating physician during the arbitration hearing.  *See* Def.'s Mot. for Summ. J. at 18-19.  Problematically for the Library, the ADA's definition of disability also includes "being regarded as having such an impairment."  42 U.S.C. § 12102(2)(C).  According to the Supreme Court,

> there are two apparent ways in which individuals may fall within this statutory definition:  (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities; or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.  In both cases, it is necessary that a covered entity entertain misconceptions about the individual . . . .

46

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

The Library's motion, and its subsequent reply, essentially fail to address this possibility.

Such a failure is significant, because it is uncontested that as a result of Plaintiff's complaints

about her lumbar disc syndrome, the Library -- in the late 1990s -- undertook

> substantial ameliorative efforts to abate the 'draft' problem, including enclosing
> [Plaintiff's] workspace with glass partitions, providing a space heater, disabling
> the air vents within [Plaintiff's] workspace, and testing the partitioned area to
> ensure that it complied with applicable regulations regarding temperature, air
> flow, and humidity.

Def.'s Mot. for Summ. J., Ex. 21 (arbitrator's denial of Plaintiff's reinstatement) at 2; *see also*

*id.*, Ex. 5 (5/2/01 Notice of Adverse Action).  Indeed, as early as December 1997, the Library

recognized the need to ensure that Plaintiff was not in a "drafted area" constituted a "permanent

accommodation."  *See* Def.'s Notice of Filing, Attach. 3, Ex. B (Nov. 9, 2000 Garrison Memo) at

1.  From October 1998 through February 2000, the Library undertook significant efforts, as

described above, in order to alleviate any discomfort or injury for Plaintiff, and then conducted

multiple scientific tests in order to substantiate its efforts.  While Ms. Garrison maintained that

these efforts were solely "for compassionate reasons," *id.* at 1-2, given the substantial effort and

expense that went into these projects, there appears to exist a genuine issue of material dispute as

to whether the Library "regarded" Plaintiff as having a qualifying impairment of a major life

activity pursuant to 42 U.S.C. § 12102(2)(C).  As such, the Library's basic contention that

Plaintiff was not a "qualified individual" under the ADA is not sufficient to warrant summary

judgment.

However, while the substantial efforts taken by the Library could be considered as proof

that the Library considered Plaintiff to be disabled under the ADA, those same efforts undermine

her groundless assertion that the Library somehow failed to reasonably accommodate her disability.  In interpreting and enforcing the ADA, courts have drawn careful lines to protect the availability of employment for persons with qualifying disabilities, while not extending the contours of those protections to disallow the normal operation of workplace discipline.  *See Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120, 130 (D.D.C. 2003).  An employer must "mak[e] reasonable accommodations to the known physical or mental limitations" of an employee.  42 U.S.C. § 12112(b)(5)(A).  This provision requires an "employer [to] be willing to consider making changes in its ordinary work rules . . . in order to enable a disabled individual to work."  *Vande Zande v. Wisconsin*, 44 F.3d 538, 542 (7th Cir. 1995).  Under the ADA, the term "reasonable accommodation" may include --

> A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities

42 U.S.C. § 12111(9).  However, "[a]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied."  *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).

Importantly, Plaintiff's Opposition focuses entirely on a single sentence assertion in support of her Count V allegation:  "Mr. Columbia, Plaintiff's supervisor, removed the partitions that exacerbated [sic] Plaintiff's disability, and although the partitions were eventually restored, Plaintiff's condition had become such that Defendant could have only considered her permanently disabled to provide her with LWOP ["Leave Without Pay"] status for almost a

year." Pl.'s Opp'n at 6.  Besides providing no evidence to the Court in support of this allegation,

numerous problems exist to undermine Plaintiff's reasoning.  First, the argument made by

Plaintiff in her Opposition is wholly unrelated to the actual content of her allegations in Count V;

rather, Count V focuses on an alleged denial by Ms. Washington at ISS of Plaintiff's request for

a reasonable accommodation, and does not discuss any actions by Mr. Columbia.  *See* Second

Am. Compl. ¶¶ 51-52.  Second, even assuming *arguendo* that such a new, unrelated claim is

worthy of the Court's consideration, Plaintiff was transferred to the Library's ISS Division in

July 1996.  *Id.* ¶ 21.  "After her transfer to ISS, Plaintiff was diagnosed with degenerative lumbar

disc syndrome.  Because of this disease, Plaintiff's treating physician permanently restricted her

exposure to air drafts."  *Id.* ¶ 24.  Plaintiff's reference to Mr. Columbia's actions, which led to

the dismantling of her partitions in October 1993, *id.* ¶ 17, is therefore unavailing because --

pursuant to Plaintiff's own allegations in her Second Amended Complaint -- she was not

diagnosed with *degenerative* lumbar disc syndrome until 1996 or later.  Plaintiff is essentially

attempting to conflate two different episodes in order to support her ADA claim -- a misdirection

that the Court declines to follow.

Importantly, on October 1, 1998, Plaintiff was moved to the Library Madison Building

327 where the Parking Program Office is located.  Once in LM 327, she "had a health-related

complaint regarding the 'draftiness' of her new office space, as well as a letter from her personal

physician that she had a permanent medical restriction that precluded her from sitting in a drafty

area and that she could not return to work until changes were made to her work environment."

Def.'s Mot. for Summ. J., Ex. 21 (arbitrator's denial of Plaintiff's reinstatement) at 2; *see also*

*id.*, Ex. 5 (5/2/01 Notice of Adverse Action) at 1 ("Your health care provider has indicated to the

Library's Health Services Office that you have a permanent medical restriction which precludes your sitting in a drafty area and that you could not return to work until changes to your work environment were made.").  Upon receipt of this information, the Library, by the end of November 1998, had enclosed Plaintiff's workspace with glass partitions, disabled the air vents surrounding her work area, and tested the work station to ensure proper compliance with Plaintiff's temperature, air flow, and humidity needs.  *See supra* Section I(B).[5]

By July 1999, after further correspondence with Plaintiff and her doctor, the Library provided Plaintiff a space heater for her area.  Def.'s Notice of Filing, Attach. 3, Ex. B (November 9, 2000 Garrison Memo) at 2.  Still unhappy with her conditions, the Library once again conducted exhaustive tests on Plaintiff's workspace in February 2000, and found -- as it had previously -- that the workstation met or exceeded all applicable ASRAE standards.  Def.'s Mot. for Summ. J., Ex. 5 (5/2/01 Notice of Adverse Action), Attach. C (2/25/00 Memo to Linda Washington from Robert S. Browne, Safety Services office) at 1-2.  The Library took all of these steps, and encountered substantial costs, despite the fact that Plaintiff's physician failed to provide requested details regarding her lumbar disc syndrome, and failed to personally analyze Plaintiff's improved workspace.  Def.'s Noitce of Filing, Attach. 3, Ex. A (Feb. 29, 2000 memorandum from Ms. Garrison to Ms. Nichols) at 1.

In addition to these substantial and costly physical renovations to accommodate Plaintiff, the Library also exhibited great patience in dealing with Plaintiff's alleged medical incapacities. Indeed, Plaintiff was granted Leave Without Pay during a ten-month period stretching from

---

[5] Plaintiff admittedly had no knowledge of whether the Library's exhaustive tests were accurate or not.  *See id.*, Ex. 10 (Nichols Dep.) at 30:10-11

March 3, 2000, to January 9, 2001, in order to allow her rehabilitation time for any lingering

maladies.  *See id.*, Ex. 21 at 2.  During her prolonged absence, other employees were required to

subsume her duties at the Library in addition to their own, and the efficiency of the Parking

Program Office's operations was negatively impacted.  *Id.*  Given the significant leave time

provided, the negative impact on the office's operations, and the substantial accommodations

afforded to Plaintiff's workspace, Ms. Garrison finally ordered Plaintiff back to work on January

9, 2001.  *Id.*

 In sum, Count V of Plaintiff's Second Amended Complaint complains that "she requested

to be placed in a draft-free work area as a reasonable accommodation to her disability" but that

"Ms. Washington denied Plaintiff's request for a reasonable accommodation."  Second Am.

Compl. ¶¶ 51-52.  However, all evidence in the record indicates that after Plaintiff had requested

that the Library accommodate her degenerative lumbar disc syndrome by reducing the

"draftiness" of her workspace on October 2, 1998, the Library provided the requested

accommodation by November 1998.  When Plaintiff asked for modifications, such as for a space

heater, the Library promptly responded to her requests; when Plaintiff displayed continued

skepticism, the Library conducted further scientific tests.  While Count V is silent as to any

further charges that the Library failed to accommodate her alleged disability, it is worth noting

that the Library also stretched its resources to the breaking point by providing Plaintiff a ten-

month Leave Without Pay period between March 2000 and January 2001 in order to allow

Plaintiff to rest her condition and further accommodate her alleged needs.  *See, e.g.*, *Sampson v.

Citibank, F.S.B.*, 53 F. Supp. 2d 13, 18 (D.D.C. 1999) (an employer is not required to grant an

indefinite leave period under the ADA as a reasonable accommodation); *Hudson v. MCI*

*Telecommunications Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996) (summary judgment for defendant appropriate where plaintiff failed to present evidence of the expected duration of her leave, despite physician's report that impairment was not expected to be permanent); *cf. Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir. 1994) (employee who cannot meet the attendance requirements of a job is not a "qualified" individual under the ADA). The Library's substantial and costly efforts, made over numerous years, were certainly sufficient to meet the reasonable accommodation requirements imposed by the ADA, and Plaintiff has introduced no evidence indicating otherwise. *See* 42 U.S.C. § 12111(9).

Given the uncontested fact that Plaintiff requested a specific accommodation regarding "draftiness" and the Library delivered such an accommodation and more, Plaintiff's ADA claim under Count V of a failure to provide a reasonable accommodation is simply without merit. Plaintiff has adduced no evidence supporting her theory, and her myriad of confusing, contradictory, and unsubstantiated allegations otherwise are simply insufficient to avoid summary judgment. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (a non-moving party may not survive a motion for summary judgment with "conclusory allegations" and "unsubstantiated assertions"). Accordingly, the Court shall dismiss Count V of Plaintiff's Second Amended Complaint.

**IV:  CONCLUSION**

For the reasons set forth above, the Court shall grant Defendant's Motion for Summary

Judgment.  An Order accompanies this Memorandum Opinion.


Date:   July 25, 2005

                                        _____/s/_____
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge